```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
UNITED STATES OF AMERICA,                                        :
                                                                 :
            -v-                                                  :
                                                                 :      21-cr-777 (LJL)
BATISE BOYCE,                                                    :
                                                                 :      MEMORANDUM AND
                                    Defendant.                   :      ORDER
                                                                 :
-----------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/15/2022

LEWIS J. LIMAN, United States District Judge:

Defendant Batiste Boyce moves in limine for the Court to decide whether he is subject to the sentencing enhancements set forth in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). Dkt. No. 17.

## BACKGROUND

Boyce is charged in a five-count indictment. Dkt. No. 1. Counts One to Three charge Boyce with being a felon in possession of ammunition and/or a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), on three separate occasions in 2020. Count Four charges him with distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(C). Count Five charges him with the knowing use and carriage of a firearm during and in relation to the drug trafficking crime charged in Count Four and with the possession of that firearm in furtherance of the drug trafficking crime.

Each of Counts One to Three charge Boyce with being an armed career criminal by virtue of having had three previous convictions for violent felonies and serious drug offenses. The three alleged prior convictions are: (1) a conviction on or about September 26, 2013, in Bronx County Supreme Court, for Attempted Assault in the Second Degree, in violation of New York

Penal Law § 120.05(1), committed on or about February 23, 2011; (2) a conviction on or about September 26, 2013, in Bronx County Supreme Court, for Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.39(1), committed on or about June 26, 2009; and (3) a conviction on or about June 8, 2001, in Bronx County Supreme Court, for Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.16(1), committed on or about August 27, 1999.

The Government recites the lurid facts of Boyce's crime—he shot one of his victims in the head and another in the back, after having sustained multiple prior convictions.  Dkt. No. 21 at 1.  The question in this case, however, is not whether Boyce deserves punishment for his crimes or even whether he should serve the fifteen years in prison required for armed career criminals.  The question is whether the decision regarding Boyce's sentence is remitted to the discretion of the Court, to be guided by the Sentencing Guidelines and the factors set forth at 18 U.S.C. § 3553(a), or rather whether that decision already has been made by Congress applicable to Boyce and all others with the same statutory violations under New York law regardless of the specific circumstances of their offenses and of the individual characteristics of the defendant.

## DISCUSSION

Under the ACCA, a person who has three prior convictions for violent felonies or serious drug offenses is subject to a mandatory minimum sentence of fifteen years if convicted of possessing a firearm or ammunition that has been transported in interstate commerce.  18 U.S.C. § 924(e)(1).  The term "serious drug offense" is defined to mean:

> (i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46, for which a maximum term of imprisonment of ten years or more is prescribed by law; or
>
> (ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in

section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law.

18 U.S.C. § 924(e)(2)(A).

Courts apply a categorical approach to determine whether a state law involves the manufacturing or distribution of a controlled substance as defined under federal law. *See United States v. Townsend*, 897 F.3d 66 (2d Cir. 2019); *see also Taylor v. United States*, 495 U.S. 575 (1990). The statutory language "is concerned with the existence of a valid prior conviction and the statute of conviction, [i.e.] 'to the fact that the defendant has been convicted of crimes falling within certain categories, and not to the facts underlying the prior conviction.'" *United States v. Thompson*, 961 F.3d 545, 550 (2d Cir. 2020) (quoting *Taylor*, 495 U.S. at 600). "'Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute' by 'looking only to the statutory definitions—i.e., the elements—of the offense, and not to the particular underlying facts.'" *Hylton v. Sessions*, 897 F.3d 57, 60 (2d Cir. 2018) (quoting *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018) (quoting *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006), and *Descamps v. United States*, 570 U.S. 254, 261 (2013))). If a state statute is broader than its federal counterpart—that is, if the state statute criminalizes some conduct that is not criminalized under the analogous federal law—the state conviction cannot be used to enhance the base offense level under the United States Sentencing Guidelines or under the ACCA. *Townsend*, 897 F.3d at 72.[1]

---

[1] "[A]n overbroad state statute can serve as a categorical match if it is divisible into separate offenses, and the underlying indictment, information, or jury instructions (to which the sentencing court may turn when the state statute is divisible to ascertain the relevant crime to which the categorical approach will apply) reveal that the offense of conviction has elements no broader than those of the federal analog." *Thompson*, 961 F.3d at 554. No claim is made here that the New York Penal Law provisions are divisible.

3

"[W]hen a statute has indeterminate reach, and where minimum conduct analysis invites improbable hypotheticals," the defendant must show that there exists a "realistic probability" that the state would apply its statute to conduct that falls outside the definition of the federal offense. *Hylton*, 897 F.3d at 63. Where a statute is vague or ambiguous and "the boundaries of the offense conduct [a]re ill-defined and the court [i]s tasked with an interpretive dilemma," the "realistic probability" test requires the defendant to "produce old state cases to illustrate what the statute makes punishable by its text." *Id.* at 64. "However, 'when the state statute on its face reaches beyond the generic federal definition,' no legal imagination is necessary to find that the state statute is overbroad." *Thompson*, 961 F.3d at 554. Thus, when the state statute "on its face criminalizes conduct that is not covered by the federal analog," it is overbroad and cannot constitute a categorical match. *Id.*; *see also Hylton*, 897 F.3d at 64 ("The realistic probability test is obviated by the wording of the state statute, which on its face extends to conduct beyond the definition of the corresponding federal offense.").

The categorical approach here requires comparison of the New York state statutes of which Boyce was convicted—New York Penal Law 220.39(1) and New York Penal Law 220.16(1)—with their federal analogues. Section 220.39(1) provides: "A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug." N.Y. Penal Law § 220.39(1). Section 220.16(1) provides: "A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses . . . a narcotic drug with intent to sell it." N.Y. Penal Law § 220.16(1). In turn, "[n]arcotic drug" is defined as "any controlled substance listed in schedule I(b), I(c), II(b) or II(c)" of New York Public Health Law § 3306 "other than methadone." N.Y. Penal Law § 220.00(7). Schedule II(b)(4) lists as a narcotic drug "[c]oca leaves and any salt, compound,

derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers." N.Y. Pub. Health L. § 3306, Sched. II(b)(4).  Isomers are chemical compounds "that have the same composition but differ in the chemical arrangement of their constituents."  *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 252 (2d Cir. 2014); *see also United States v. Phifer*, 909 F.3d 372, 376  (11th Cir. 2018) (defining isomers as "molecules that share the same chemical formula but have their atoms connected differently, or arranged differently in space"); *United States v. Hagood*, No. 20-cr-656 (PAE) (S.D.N.Y. Mar. 9, 2022), ECF No. 87; Merriam-Webster, accessible at https://www.merriam-webster.com/dictionary/isomer (accessed June 15, 2022) (defining isomer as "one of two or more compounds, radicals, or ions that contain the same number of atoms of the same elements but differ in structural arrangement and properties"); Random House Dictionary of the English Language (defining isomerism as "the relation of two or more compounds, radicals, or ions that are composed of the same kinds and numbers of atoms but differ from each other in structural arrangement").  By its plain language, the New York statute does not limit the isomers of cocaine considered to be narcotic drugs and instead reaches all isomers of cocaine, including positional isomers and other isomers.  *See, e.g.*, *United States v. Fernandez-Taveras*, 511 F. Supp. 3d 367, 373 (E.D.N.Y. 2021); *Phifer,* 909 F.3d at 377 (distinguishing between stereoisomers which include optical and geometric isomers and constitutional or structural isomers which include positional isomers).

By contrast, the analogous federal term under 21 U.S.C. § 802—"controlled substance"—is more narrowly drawn.  Schedule II of the federal Controlled Substances Act includes as a controlled substance "[c]oca leaves . . .  and any salt, compound, derivative or

preparation of coca leaves (including cocaine . . . and ecgonine . . . and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances," 21 C.F.R. § 1308.12(b)(4), but the term "isomer," as used in section 1308.12(b)(4), in turn, is specifically defined to "mean[] any optical or geometric isomer," 21 C.F.R. § 1300.01(b).  It thus does not include types of isomers such as "positional isomers and other isomers" that are not optical or geometric.  *United States v. Gutierrez-Campos*, 2022 WL 281582, at *13 (S.D.N.Y. Jan. 31, 2022).  Reading the two regulations together, optical and geometric isomers of cocaine are Schedule II controlled substances, but other isomers of cocaine are not.

      Boyce argues that the term "narcotic drug" as used in the New York Penal Law is not a categorical match for the term "controlled substance" used in the federal analogue because the New York statute "on its face reaches beyond the generic federal definition," *Thompson*, 961 F.3d at 554 (internal quotation marks and citations omitted), and criminalizes the sale and possession of all cocaine isomers, including positional isomers, and not just geometric and optical isomers.  He argues that the legislature's decision not to qualify or limit the definition of isomer under the New York statute was considered and is neither vague nor ambiguous.  For its part, the Government argues that there is a match between the federal and state definitions because both the state statute and the federal regulation (21 C.F.R. § 1308.12(b)(4)) refer on their face to "isomers" without limitation.  It also argues that the state statute elsewhere, but not with respect to these statutes, defines "isomer" to include "the optical, position and geometric isomers," and thus the definition of "isomer" as applied to the New York Penal Law must mean something other than "optical, position and geometric isomers."  Finally, without quite saying it, the Government resorts to the canon against absurdity—it argues that because New York

6

obviously does not prosecute selling all isomers of cocaine, the statute must be read to be limited to geometric or optical isomers.

Boyce's argument faithfully interprets the federal and New York statutes and applies the Second Circuit case law to them.  The Government "engages in a strained reading" of New York law, *Thompson*, 961 F.3d at 553, misreads the relevant federal regulations, and makes conclusions that do not follow from its premises.  Schedule II of the federal Controlled Substances Act does not include all isomers of coca leaves but only includes the "optical or geometric isomer."  21 C.F.R. § 1300.01(b).  The Government can reach a contrary conclusion only by omitting the language of Section 1300.01(b)(21) of the Title 21 of the Code of Federal Regulations.  The state law "on its face" reaches far more broadly.  It does not limit the isomers included and instead covers all isomers.  The Government argues that other sections of the New York Public Health Law (in particular that defining hallucinogenic substances under Schedule I) limit the definition of isomers to "optical, position and geometric isomers," but that language undermines the Government's argument rather than supporting it.  It demonstrates that the New York state legislature knew how to limit the definition of isomers when it intended to do so.  In fact, another provision of the New York Public Health Law, which addresses opiates, defines "the term isomer [to] include[] the optical and geometric isomers" for certain purposes.  N.Y. Public Health Law § 3306, Sched. II(b).  That the New York legislature explicitly limited the definition of isomer for hallucinogenic substances and opiates but not for cocaine is powerful textual evidence that it did not intend the courts to import a limitation on the definition of cocaine.[2]

---

[2] The Government argues that the "isomers" as used in the New York Public Health Law cannot mean "all" isomers without rendering the language in the provisions defining isomers for hallucinogenic substances to include only certain isomers surplusage.  According to its argument,

The Government attempts to manufacture ambiguity by noting that "[b]y one estimate, there are at least 12,271 substances that qualify as isomers of cocaine, depending on the definition used," Dkt. No. 21 at 8 n.5, and that one of those isomers—scopolamine—is a widely sold prescribed anti-nausea mediation, *id.* at 4. It thus asserts there is no "realistic probability" that the state would prosecute sale of scopolamine or any sale of cocaine isomers other than optical or geometric isomers. However, "the 'realistic probability' test simply does not apply 'when the statutory language itself, rather than the application of legal imagination to that language, creates the realistic probability that a state would apply the statute to conduct beyond the generic definition.'" *Williams v. Barr*, 960 F.3d 68, 78 (2d Cir. 2020) (quoting *Hylton*, 897 F.3d at 63). Here, as in *Williams v. Barr*, "the mismatch with the federal statute is not created by 'legal imagination' applied in the context of an apparent match, but by the state's statutory language itself." *Id.* Indeed, even as a matter of statutory interpretation, it does not follow from the Government's premise that the legislature did not contemplate that the sale of scopolamine would be prosecuted that it somehow intended, notwithstanding the language it used, the statutory definition of cocaine to be limited to optical or geometric isomers. "[T]he plain text of Schedule II(b) of New York's law . . . makes clear that the state's definition of cocaine includes all isomers of cocaine." *Gutierrez-Campos*, 2022 WL 281582, at *15.

---

there would be no reason for the legislature to specify that isomers for purposes of hallucinogenic substances "include" "optical, position and geometric isomers" if, in fact, isomers as a general term already included every isomer. But that argument proves too much. The language of the New York Public Health law with respect to cocaine does not specify any particular isomers that are included in the definition, instead using the generic term. Thus, if the Government's approach to statutory interpretation were correct and consistently applied, the definition of cocaine would not include any isomers because the statutory language does not specify any particular type of isomer included within the definition.

To the contrary, while resort to legislative history is not necessary to resolve the issue before the Court, there is every reason to believe that the New York state legislature meant what it said when it included all isomers, without limitation, within the definition of cocaine. As Judge Garaufis has recently explained:

> According to the definition of "isomer" under the CSA, as used in Section 1308.12(b)(4), covering cocaine, "the term 'isomer' means any optical or geometric isomer." 21 C.F.R. § 1300.01(b). In addition to optical and geometric isomers, there are also "positional" isomers, which are not included in the definition of cocaine. *Phifer*, 909 F.3d at 378. In contrast, in the subsection of the CSA's definitions covering hallucinogenic drugs, "'isomers' means any optical, positional, or geometric isomer." 21 C.F.R. § 1300.01(b).
>
> Thus, the federal scheme excludes positional isomers from its definition of cocaine but includes them in its definition of hallucinogens. The New York Legislature made a different policy choice to define cocaine as broadly as possible, including all isomers. The Legislature implemented that policy for two reasons: (1) to ease the financial burden on police laboratories that would need to purchase expensive equipment to differentiate between different isomers of cocaine; and (2) to avoid risk that any legalized form of cocaine might pose to the public. (*See* Bill Jacket at ECF p. 6.) As a result of the difference in the definitions of cocaine under New York law and federal law, possession of certain cocaine isomers is illegal under the New York statute but legal under the CSA.

*United States v. Fernandez-Taveras*, 511 F. Supp. 3d 367, 373–74 (E.D.N.Y. 2021), *appeal withdrawn sub nom. United States v. Taveras*, 2021 WL 1664107 (2d Cir. Apr. 5, 2021); *see also Gutierrez-Campos*, 2022 WL 281582, at *15 ("[I]t appears that the New York legislature intended to have its law reach all cocaine isomers. When the New York legislature amended the definition of cocaine under Schedule II in 1978, it was concerned about the increasing number of challenges brought in federal prosecutions over whether certain isomers of cocaine constituted controlled substances so as to support a criminal conviction under the federal statute. Specifically, the New York legislature was concerned with the difficulty in distinguishing between a 'levo isomer,' which 'occurs naturally in coca leaves and can be chemically synthesized so this isomer is clearly within Schedule II(a)(4),' and a 'dextro isomer,' which 'is

9

the mirror image of the levo isomer' but 'is not chemically identical' and thus has created 'debate among chemists as to whether or not it is a controlled substance.'  The legislature worried that, should courts decide that a dextro isomer of cocaine is not a controlled substance, criminal prosecutions could face several obstacles, including requiring expensive laboratory testing to differentiate between different isomers of cocaine and potentially '[e]xposing the public to the risks entailed by a legalized form of cocaine' (*i.e.*, a dextro isomer), which, the sponsors of the legislation noted, 'appears to be contrary to the legislative intent of Section 3306 of the Public Health Law.'  To address the 'problems' caused by this 'isomer defense' and to close 'the statutory loophole,' the New York legislature amended the definition of cocaine to 'include *all isomers* of cocaine and ecgonine in the schedule of controlled substances.'  Thus, while it may be the case that the legislature was primarily concerned with dextro isomers of cocaine, it nonetheless deliberately chose to address the 'problems' and 'the statutory loophole' by amending New York's definition to reach all isomers of cocaine." (citations omitted)).

      The Court thus joins the growing list of courts in this Circuit that have held that there is no categorical match between a controlled substance under federal law and a narcotic drug under New York Penal law.  *See United States v. Hagood*, No. 20-cr-656 (PAE) (S.D.N.Y. Mar. 9, 2022), ECF No. 87; *Gutierrez-Campos*, 2022 WL 281582, at *14 (citing cases).

      In light of the Court's conclusion, it need not reach Boyce's argument that the New York statute reaches more broadly than the federal one because the state statute includes naloxegol within the definition of opium derivatives whereas the federal statute (at least since 2015) explicitly does not.  *See* Dkt. No. 18 at 9–10.[3]

---

[3] Boyce also argues that his conviction for violating New York Penal Law § 110-120.05(1) does not constitute a crime of violence but, as he recognizes, the Second Circuit has already rejected that argument.  *See United States v. Brown*, 2 F.4th 109, 110 (2d Cir. 2021).

**CONCLUSION**

For the reasons stated, Boyce's motion is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 17.

SO ORDERED.

Dated: June 15, 2022
      New York, New York

                                        LEWIS J. LIMAN
                                  United States District Judge